THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JULIUS LOBEL and IRVING COHEN, Appellants.

Argued June 2, 1948; decided October 21, 1948.

*I. Maurice Wormser* and *Martin Benjamin* for Julius Lobel, appellant. I. The trial court erred in allowing proof of asserted false pretenses and representations which were not in any way alleged or set forth in the indictment. (Penal Law, § 1290; L. 1942, ch. 732, § 2; as amd. by L. 1943, ch. 224.) II. The trial court's charge was erroneous and highly prejudicial. (C. J., Summary of Evidence, § 1170, p. 713; *Minner* v. *United States,* 57 F. 2d 506; *People* v. *Wolf,* 183 N. Y. 464; *People* v. *Thomas,* 240 App. Div. 101; *Williams* v. *United States,* 93 F. 2d 685; *Quercia* v. *United States,* 289 U. S. 466.) III. Defendant Lobel was denied due process of law in violation of his constitutional rights under the Fourteenth Amendment of the Constitution of the United States. (*United States* v. *Marchant,* 12 Wheat. [U. S.] 480; *Hayes* v. *Missouri,* 120 U. S. 68; *Pointer* v. *United States,* 151 U. S. 396.)

*William W. Kleinman* and *David F. Price* for Irving Cohen, appellant. I. The guilt of appellant Cohen was not established beyond a reasonable doubt. (*People* v. *Tavormina,* 257 N. Y. 84; *United States* v. *Rabinowich,* 238 U. S. 78; *Sealfon* v. *United States,* 332 U. S. 575; *People* v. *Gerst,* 137 App. Div. 272; *People* v. *Cannon,* 236 App. Div. 155; *People* v. *Josephs,* 143 App. Div. 534; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Taddio,* 292 N. Y. 488; *People* v. *Winter,* 288 N. Y. 418; *People* v. *Lahn,* 258 App. Div. 225; *People* v. *Connelly,* 189 App. Div. 82; *People* v. *Galbo,* 218 N. Y. 283.) II. The trial court committed reversible error in permitting proof by the prosecution of false pretenses, none of which were alleged in the indictment. (*People* v. *Willett,* 102 N. Y. 251; *People* v. *Dumar,* 106 N. Y. 502; *People* v. *Noblett,* 244 N. Y. 355; *People* v. *Ehrlich,* 190 App. Div. 302; *People* v. *Cohen,* 148 App. Div. 205; *People* v. *Sloane,* 254 App. Div. 780;

*People* v. *Page,* 182 Misc. 253; *People* v. *Salter,* 191 App. Div. 723; *People* v. *Ryan,* 274 N. Y. 149.) III. The trial court erred in its charge. (*People* v. *Maione,* 284 N. Y. 423; *People* v. *Pignataro,* 263 N. Y. 229; *People* v. *Lazar,* 271 N. Y. 27; *People* v. *Wolf,* 183 N. Y. 464; *People* v. *Feldman,* 296 N. Y. 127; *People* v. *Montesanto,* 236 N. Y. 396.) IV. The trial court erred in denying Cohen's motion to dismiss the indictment upon the ground that the evidence before the grand jury was insufficient to warrant the finding of said indictment. (*People* v. *Lahn,* 258 App. Div. 225; Code Crim. Pro., § 258; *People* v. *Glen,* 173 N. Y. 395; *People* v. *Nitzberg,* 289 N. Y. 523.) V. Irrelevant and incompetent testimony was admitted which, with the prejudicial summation of the district attorney, deprived Cohen of a fair and impartial trial. (*People* v. *Kress,* 284 N. Y. 452; *People* v. *Mullens,* 292 N. Y. 408; *People* v. *Haas,* 105 App. Div. 119; *People* v. *Hovell,* 109 Misc. 510; *People* v. *Ledwon,* 153 N. Y. 10; *People* v. *Suffern,* 267 N. Y. 115; *People* v. *Lewis,* 275 N. Y. 33.) VI. Appellant Cohen has been deprived of his liberty without due process of law. The trial court permitted jurors to be sworn who were challenged peremptorily by Cohen but who were not peremptorily challenged by defendant Lobel, and these jurors participated in the verdict. (*People* v. *Doran,* 246 N. Y. 409; *People* v. *McQuade,* 110 N. Y. 284; *People* v. *Grieco,* 266 N. Y. 48; *Betts* v. *United States,* 132 F. 228; *United States* v. *Marchant,* 12 Wheat. [U. S.] 480; *Pointer* v. *United States,* 151 U. S. 396.)

*Miles F. McDonald, District Attorney* (*Solomon A. Klein* of counsel), for respondent. I. Guilt was established beyond a reasonable doubt. (*People* v. *Crum,* 272 N. Y. 348; *People* v. *Cashin,* 259 N. Y. 434; *People* v. *Sugarman,* 248 N. Y. 255; *People* v. *Pesky,* 254 N. Y. 373; *People* v. *McCarthy,* 250 N. Y. 358; *People* v. *Katz,* 209 N. Y. 311; *People ex rel. Woronoff* v. *Mallon,* 222 N. Y. 456; *Woloszynowski* v. *New York Central R. R. Co.,* 254 N. Y. 206; *People* v. *Gerks,* 243 N. Y. 166; *People* v. *Hines,* 284 N. Y. 93; *People* v. *O'Neil,* 48 Hun 36, 109 N. Y. 251; *People* v. *Crossman,* 241 N. Y. 138.) II. Testimony as to the forged invoices was properly received in evidence. (*People* v. *Ashworth,* 220 App. Div. 498; *People* v. *Bennett,* 37 N. Y. 117; *Phelps* v. *People,* 72 N. Y. 334; *People* v. *Brenneauer,* 101 Misc. 156;

*Regina* v. *Cooke,* 12 Cox Crim. Cases 10; *People* v. *Noblett,* 244 N. Y. 355; *People* v. *Hennessey,* 15 Wend. 147; *People* v. *Meadows,* 199 N. Y. 1; *People* v. *Rothstein,* 180 N. Y. 148; *People* v. *Dumar,* 106 N. Y. 502; *People* v. *Sattlekau,* 120 App. Div. 42.)

LEWIS, J.   The indictment upon which rests the judgment of conviction against each of the two defendants-appellants, originally contained 479 counts which charged the appellants and three other defendants with grand larceny first degree and forgery second degree.   The indictment also charged that the acts and transactions alleged in the several counts were "connected together and constitute part of a common plan and scheme."   Prior to the trial certain counts charging forgeries and larcenies were dismissed on motion by reason of lack of jurisdiction and insufficiency of evidence before the grand jury; other counts were severed on motion by the district attorney.   During the trial all counts charging forgery were dismissed upon the ground that the alleged forgeries were not committed within the jurisdiction of the County Court of Kings County.   Of the remaining charges the trial judge submitted to the jury seventy-six counts which charged the defendant Lobel with grand larceny first degree, involving his participation during the year beginning October 18, 1945, in the taking from Mergenthaler Linotype Company — hereinafter referred to as Mergenthaler — of seventy-six checks in amounts totaling more than $400,000.   The jury found Lobel guilty as charged in each of the seventy-six counts submitted for its consideration.   As against the defendant Cohen the jury was permitted to consider fifty-six counts charging grand larceny first degree upon which he was found guilty under forty-one counts involving his participation in taking from Mergenthaler forty-one checks in amounts totaling in excess of $152,000.

At the Appellate Division the judgment convicting the defendant Lobel was affirmed unanimously; the judgment convicting the defendant Cohen was affirmed, two justices dissenting and voting to reverse on the law and to dismiss the indictment upon the ground that the specific crimes submitted to the jury were not proved beyond a reasonable doubt. (273 App. Div. 978.)   The appeal by the defendant Lobel is by permission of a member of this court; the appeal by the defendant Cohen is by permission of a justice of the Appellate Division.

One of four individuals named in the indictment was W. Arthur Nickel who, before the jury was selected, pleaded guilty to 202 counts of the indictment and thereafter testified for the prosecution. Nickel was employed by Mergenthaler as the head of the accounts-payable division of its executive accounting department. Among the functions of that division was the preparation in triplicate of checks to cover approved invoices bearing notations made in the various departments which had received the supplies to which the attached invoices referred. The daily grist of those checks — which numbered more than 2,000 a month — with attached invoices covering the items purchased, were presented by Nickel or by one of his subordinates to authorized officers for signature. After they were signed they were sent back to the accounts-payable division where it became the duty of Nickel and his subordinates to mail the original checks to the vendor-creditors and to retain two copies for office records to aid in reconciling the Mergenthaler bank balances. There came a time in September, 1945, when Nickel was induced by persons outside the Mergenthaler office staff to participate in a scheme by which he prepared and submitted to authorized Mergenthaler officers for signature checks drawn to fictitious payee-creditors whose names were chosen by him to simulate the names of creditor companies then doing business with Mergenthaler. For examples — '' *Clifton* Manufacturing Company '' for '' *Clifford* Manufacturing Company '' and '' A. O. *Schumacher* & Sons '' for '' A. O. *Schoonmaker* & Sons.'' It was the appellant Lobel — not an employee of Mergenthaler — who arranged for the printing of invoices bearing the name of the fictitious creditors. Lobel also caused to be made a rubber stamp similar to the stamp used by the Mergenthaler purchasing department, and had a special die cut which duplicated the trade-mark of the creditors whose trade names were simulated. On October 12, 1945, Lobel delivered to Nickel the printed forms of simulated invoices and the rubber stamp. At that meeting he and Nickel arranged to meet on Monday and Thursday nights at an agreed place where Nickel was to deliver any checks he had stolen and collect his share of the proceeds of any checks Lobel had been able to cash. It was also agreed at that meeting that Lobel was

to establish a bank account under an assumed name as owner of the fictitious creditor " Clifton Manufacturing Company ".

It was at this point that Lobel sought the aid of the appellant Cohen to assist him in opening a bank account under an assumed name. Such account — in the name of " Robert A. Burton " — was opened at the Modern Industrial Bank where Cohen introduced Lobel.

The first check was stolen by Nickel on October 15, 1945, and was payable to " Clifton Manufacturing Company ". There were later stolen by Nickel twenty-three other checks payable to the same fictitious creditor and numerous checks to the order of " A. O. Schumacher & Sons " and " Weber & Scher Manufacturing Company ". The technique by which each of the many thefts was accomplished was the same. In each sheaf of checks which Nickel sent up for signature by authorized Mergenthaler officers he included one or more checks with attached invoices which he had prepared and which subsequently he stole and delivered to Lobel. The checks drawn by Nickel to the order of the fictitious creditors " Clifton Manufacturing Company " and " A. O. Schumacher & Sons " had attached thereto forged invoices; the checks drawn by Nickel payable to " Weber & Scher Manufacturing Company " had attached thereto legitimate invoices. In each instance the authorized officers of Mergenthaler, relying upon the honesty of Nickel and his subordinates, signed the checks thus presented to them in the regular course of business. After the checks were signed they were sent back to the accounts-payable division, the intention of the signatory officers being — according to their testimony — that all the checks and the proceeds thereof were to be received by the payees named in the checks and not by Nickel or any of the defendants. However, when the signed checks came back to Nickel's desk, he extracted the one or more which he had prepared payable to a fictitious creditor, detached it from the copies and the invoices, placed it in an envelope and, according to his testimony, " put it in [his] pocket." Later he delivered the stolen checks to Lobel who concededly indorsed each check so delivered to him.

To establish the appellant Cohen's complicity in the larcenies the prosecution introduced evidence to prove that acts by Cohen aided Lobel in reducing the stolen checks to cash. To that end

there is evidence that Cohen introduced Lobel to the Modern Industrial Bank where Lobel was known on that bank's books and to its officers as "Burton". Lobel was also introduced by Cohen to West Thirty-Fifth Street Trading Company — a check-cashing agency, where Cohen informed the check casher — according to the latter's testimony — "that he [Cohen] is sending somebody down with a check, that I [the check casher] can cash it; that he [Cohen] is going to stand in back of it." When the bearer (Lobel) of the check — known by the check casher as "Mr. Clifton" — arrived to have a check cashed he stated he had been sent there by Cohen. In fact, other checks totaling more than $50,000 were cashed by Lobel at that agency and by the same check casher who testified — "I asked Mr. Cohen whether if anything happens to these checks, if they bounce, ' Will you make them good?' and he [Cohen] said ' Yes '." Cohen also introduced Lobel to a notary public who — as an incident in the cashing of certain checks — was induced to notarize two "trade certificates" which had already been signed by Lobel under the fictitious names of "Clifton Manufacturing Company", "John B. Clifton", "Alfred A. Schumacher", "Frank Schumacher", "George Weber" and "George Scher". When the notary inquired of Cohen as to the certificate — "' What is this?' " Cohen assured him — "' It is O. K.' " When the time came for Lobel to secure cash on checks delivered to him by Nickel and drawn to the order of the fictitious creditor of Mergenthaler — "A. O. Schumacher & Sons " — it was Cohen who, when asked by the Atlantic Trading Company — another check-cashing agency — whether a Mergenthaler check drawn to "A. O. Schumacher" should be cashed, said "' It is all right, any time he comes in with those checks, you can cash it.' " With that assurance by Cohen, Atlantic Trading Company cashed thirteen Mergenthaler checks drawn to the same fictitious payee in amounts totaling in excess of $52,000.

There were denials by the appellants Lobel and Cohen that they were involved in cashing stolen checks. Lobel testified that he was "just a messenger boy " for Nickel and that, believing the Mergenthaler checks upon which he secured cash were connected with "black market " transactions, he was paid 5% for cashing them. Cohen denied knowledge of any of the

transactions in which the Mergenthaler checks were involved.

In view of the evidence mentioned above and other evidence disclosed by the record, we cannot say as a matter of law that there is no evidence to support the jury's verdicts which have been affirmed in each instance by the Appellate Division. In fact the two justices of the Appellate Division who dissented from that court's affirmance of the judgment convicting Cohen, stated in the memorandum filed with their decision — " There is evidence that he [Cohen] aided and assisted Lobel, a codefendant * * *, to cash checks in New York County, and that the checks were stolen." The dissenting justices suggest, however, that there can be " no exclusive inference from the evidence that appellant had knowledge that the checks were stolen; and it can as readily be inferred from the evidence that his [Cohen's] knowledge was to the effect that the checks were of another character." Insofar as our disposition of this noncapital case is concerned — where the weight of evidence is not a subject for our review — it is basic that where there are conflicting inferences from proven facts the verdict of a jury is not to be set aside, in the absence of material error, unless it can be said as a matter of law that there is no evidence to support it. (*People* v. *Sugarman,* 248 N. Y. 255, 258; *People* v. *McCarthy,* 250 N. Y. 358, 364; *People* v. *Pesky,* 254 N. Y. 373.) Upon this record we do not so conclude.

We thus reach a consideration of the point of law, chiefly stressed by each appellant, that the trial court erred in allowing proof by the prosecution of false and fraudulent representation and pretense.

The larceny counts set forth in the indictment, of which the tenth count is typical, charge the defendants as follows:

## " TENTH COUNT

" THE GRAND JURY OF THE COUNTY OF KINGS, by this indictment, accuse the defendants, W. Arthur Nickel, Julius Lobel, alias Jimmy Collins, alias John B. Clifton, alias Alfred O. Schumacher, alias Robert Bell, alias George Weber, Isidore Rapoport and Irving Cohen, of the crime of GRAND LARCENY IN THE FIRST DEGREE, committed as follows:—

" The defendants, W. Arthur Nickel, Julius Lobel, alias Jimmy Collins, alias John B. Clifton, alias Alfred O. Schu-

macher, alias Robert Bell, alias George Weber, Isidore Rapoport and Irving Cohen, on or about October 18, 1945, in the County of Kings, being aided and abetted by Joseph Milstein, stole and took from the possession of Mergenthaler Linotype Company, a check and the proceeds thereof in the sum of two thousand three hundred sixty dollars and forty cents, owned by the said Mergenthaler Linotype Company, with the intent to deprive the owner thereof, and of the use and benefit thereof, and to appropriate the same to the use of the.defendants.''

'The appellants' argument has as its basis a portion of section 1290-a of the Penal Law, presently to be quoted, which is one of the enactments by which the Legislature of 1942 endeavored to put an end to the confusion and injustice which frequently had resulted from the administration of section 1290 of the Penal Law as it then read. That statute, prior to its repeal in 1942, set forth a definition of larceny which comprehended the separate crimes of larceny, embezzlement and false pretenses — with the result that the judgments of our courts following trials involving larceny often rested upon those nice distinctions which exist between common-law larceny by asportation, common-law larceny by trick and device, obtaining property by false pretenses, and embezzlement (*People* v. *Noblett*, 244 N. Y. 355, 359–360; *People* v. *Miller*, 169 N. Y. 339, 351–352; and, see, L. 1942, ch. 732, § 1).

The prefatory declaration of legislative policy found in the first section of chapter 732 of the Laws of 1942 — which statute *repealed* section 1290 of the Penal Law, and added two new sections thereafter to be known as sections 1290 and 1290-a — states the purpose of that enactment to have been to avoid confusion and injustice and to abolish the distinctions which had theretofore " differentiated one sort of theft from another ". By the new section 1290, the Legislature, after defining larceny as a single crime, added the following provisions:

" Hereafter it shall be immaterial in, and no defense to, a prosecution for larceny that: 1. The accused obtained possession of, or title to, such property with the consent of the person from whom he obtained it, provided he induced such consent by a false or fraudulent representation, pretense, token, or writing; or

" 2. The accused in the first instance obtained possession of, or title to, such property lawfully, provided he subsequently

wrongfully withheld or appropriated such property to his own use or the use of any person not entitled to the use and benefit of such property; or

" 3. The person from whom the accused obtained such property intended to part with title to, as well as possession of, such property, or with possession as well as title; or

" 4. The purpose for which the owner was induced to part with possession of such property was immoral or unworthy.' '

After making impotent as defense measures the confusing distinctions already mentioned which prompted the 1942 legislation, the Legislature inserted the new section 1290-a which provides:

" § 1290-a. PLEADING AND PROOF. In any prosecution for larceny it shall be sufficient if: 1. The indictment or information charges that the accused, with the intent to deprive or defraud another of his property or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of some person other than the true owner, stole any property of any of the kinds mentioned in section twelve hundred ninety of this article. *If, however, the theft was effected by means of any false or fraudulent representation or pretense, evidence thereof may not be received at the trial unless the indictment or information alleges such means; but as long as one of the false or fraudulent representations or pretenses alleged be proven, any other related representation or pretense, though not alleged, may be given in evidence.*

" 2. The indictment or information is supported by proof of the commission by the accused of any one of the acts that constitute larceny as defined in this article." (Italics supplied.)

Relying on the italicized portion of the statute last quoted above, the appellants contend that the thefts upon which the indictment before us is based were " effected " by means of false and fraudulent representation or pretense, and that therefore — false pretense not being charged in the indictment — the evidence given by Nickel and the Mergenthaler officers descriptive of certain false pretenses was erroneously received in evidence.

The district attorney does not dispute that a false invoice is a false representation. Nor is it disputed that false invoices were used to induce Mergenthaler officers to sign the checks upon which the named payee-creditors were fictitious. Arguing for

the affirmance of the judgments of conviction, the district·attorney points to the fact that the trial court charged, *without exception*, that the larcenies set forth in the indictment were not·committed until the occurrence of Nickel's act of placing the Mergenthaler checks in his pocket. Upon that subject the court charged further, *without exception,* — " Just so long as these checks were going around in the Mergenthaler Company, regardless to whom they were made out, fictitious or otherwise, no larceny was committed. The larceny was committed, if at all, at the moment when Nickel pocketed the check with intent to steal it. Is that clear?" As those instructions to the jury went unchallenged by either appellant and thus became the law of the case, we must assume the jury, in reaching its verdict, gave full heed to them. (*People* v. *Guardino,* 286 N. Y., 132, 135; *Mulder* v. *U. S. Slicing Machine Co.,* 228 N. Y. 88, 91.) In this view, we conclude that it cannot be said — within the language of section 1290-a — that the thefts charged in the indictment were effected by means of any false or fraudulent representation or pretense which preceded the act of thievery and, accordingly, evidence thereof was properly received at the trial. The larcenies which occurred at the moment Nickel placed the checks in his pocket were outright surreptitious thefts of property belonging to Mergenthaler. That the larcenous taking in no instance was " effected " by false pretense is borne out by testimony of the Mergenthaler signatory officers that they had no knowledge that the payees named therein were fictitious but believed them to be bona fide ·creditors who had furnished supplies to Mergenthaler. The signatory officers testified further that they did not intend that Nickel, Lobel or Cohen should receive the checks or any of the proceeds therefrom.

The requirement found in section 1290-a that, where a larceny is " *effected* " by false pretense, such false pretense must be alleged, is not new. It had previously been required, in charging larceny by false pretense, to allege in the indictment at least one of the misrepresentations (*People* v. *Peckens,* 153 N. Y. 576, 588). The word " effected ", as defined by Webster's New International Dictionary, is " To produce; to do; to make; to bring to pass; to execute; enforce; accomplish." It would, therefore, appear in the present case that the false invoices did not "produce ", nor did they " bring to pass ", nor " accom-

plish '' the larcenies. The false pretenses served only to produce those checks which later were stolen.

We do not find in the language of section 1290-a an indication that the Legislature intended that every false representation occurring in the course of dealings which led up to a larceny need be pleaded, regardless of the fact that prior false representations served only to produce the item of property stolen thereafter. It is only where the theft itself is '' effected '' by false pretense that false pretense must be pleaded in the indictment to make evidence thereof admissible at the trial. As we read subdivision 1 of section 1290 of the Penal Law, a larceny effected by false pretense is not proven unless it appears that the owner of property, relying upon a false representation, voluntarily gives the thief possession or title to that property. If, as in the present case, the thief gains possession of or title to the property without the owner's consent, it cannot be said — within the language of section 1290-a — that the theft was '' effected '' by false pretense, despite the fact that prior to the actual theft false representations were made which produced the property stolen. Stated otherwise — to exclude evidence of a false representation which preceded or led up to a larceny, it must appear that the owner, relying upon the misrepresentation, *voluntarily* parted with possession of or title to the property. As already indicated the record at hand contains no evidence of any act of Mergenthaler by which it voluntarily gave to Nickel or to either appellant the checks here involved for such use as they might choose to make of them. None of the checks were payable to bearer; all of them were payable to creditors of whom many were fictitious and not known to the Mergenthaler signatory officers. It follows that title to none of the checks passed from Mergenthaler by the larcenous act by which Nickel took possession of them, which act was certainly not within the scope of his duties. (See Negotiable Instruments Law, § 28, subd. 3; *City of New York* v. *Bronx County Trust Co.*, 261 N. Y. 64.)

Nor do we agree with the appellants' position that the trial court erred in receiving evidence of false and fraudulent representation or pretense over objections that such evidence was incompetent, irrelevant and immaterial. We have seen that the indictment charged that the acts and transactions alleged in the several counts are '' connected together and constitute part of a

common plan and scheme." As to the consideration to be given by the jury to evidence of false pretenses the court charged, *without exception,* that — " the only crimes with which these defendants are charged are contained in the counts of the indictment which I am submitting to you for your determination. With respect to the theft of the Schumacher and Clifton checks, there is evidence before you that the invoices with respect to those checks were forged, that the proceeds of these checks were stolen. That evidence you may consider only as bearing on the question of the criminal intent or common plan and scheme of the defendants in the commission of the crime with which they are charged, namely, the theft of the checks. In other words, mere proof of the forgery of the invoices and the theft of the proceeds of the checks would not be enough to justify you in convicting either of the defendants of the larceny of the checks unless you are convinced beyond a reasonable doubt that they did steal those checks, acting in concert with each other. The other evidence, as I have said, bears only on the question for you to determine, that is, the intent or common plan or scheme of the defendants in the commission of the crimes charged against them." It is our conclusion that the testimony descriptive of the making of false invoices, and the different steps by which the stolen checks were cashed, was evidence which was competent, relevant and material to the charges contained in the indictment that the acts and transactions of which the appellants are accused were connected together and constituted part of a common plan and scheme.

The appellants contend that the absence of an allegation in the indictment of fraudulent representation or pretense led them to enter upon the trial without knowledge that they would be called upon to defend themselves against charges of fraud and false pretense. It appears of record that after the trial had commenced and at a time when counsel for each appellant was in court, the trial judge stated in connection with his rulings upon certain motions — " All of the counts with respect to the forging and uttering of the so-called fake invoices will be dismissed on the ground that the alleged crimes were not committed within the jurisdiction of this court." Although the record submitted to us does not contain the forgery counts thus dismissed,

the district attorney's brief contains the statement — not denied by either appellant — that "The record shows that counts 404 to 470 of the indictment charged appellants with forging and uttering the Clifton and Schumacher invoices which were used to induce the signing of the checks." Proceeding, as we do, upon the assumption that "The purpose of the averment of pretenses in the indictment is only to give the defendant notice of what may be proved against him, and the mode of obtaining the property need not be pleaded" (*People* v. *Peckens,* 153 N. Y. 576, 588, *supra*), we cannot say, in the circumstances disclosed by the presence in the original indictment of sixty-six charges which accused the appellants of forging and uttering the Clifton and Schumacher invoices, that either appellant entered the trial without knowledge that he would be called upon to defend himself against charges of fraudulent and false pretenses.

The appellants also claim that they were denied due process of law under the Fourteenth Amendment of the Federal Constitution, the asserted ground being that they were tried by jurors as to whom one appellant or the other had interposed a peremptory challenge. It appears from the record that where both appellants did not join in a peremptory challenge to a juror, the trial court ruled that the juror should be sworn. We think such ruling by the trial court was correct. Section 360 of the Code of Criminal Procedure provides — "When several defendants are tried together they cannot sever their challenges, but must join therein." Interpreting that statute this court has had occasion to say "The matter of peremptory challenges rests entirely with the Legislature. (*People* v. *Cosmo,* 205 N. Y. 91, 95, 97; *People* v. *Dunn,* 157 N. Y. 528, 535; *Hayes* v. *Missouri,* 120 U. S. 68, 69, 70.) If this were a question of challenges for cause, it would be another matter. The Legislature has no such discretionary power as to challenges for cause. * * * The defendants under this section must unite in their challenges" (*People* v. *Doran,* 246 N. Y. 409, 426, 427).

In addition to matters to which reference is made above we have given consideration to evidentiary rulings and conduct by the trial court which the appellants challenge as prejudicial to their legal rights and to which the briefs of counsel direct our attention.

Our conclusion is that the judgment as to each of the defendants should be affirmed.

DESMOND, J. (dissenting as to defendant Cohen). I concur with Judge LEWIS' opinion except that, as to appellant Cohen, I vote to reverse the conviction, and for a new trial. All the testimony as to Cohen's connection with these larcenies is circumstantial and equivocal only, not direct. That testimony, since it does not " exclude to a moral certainty every hypothesis except that of guilt " and is " ' consistent with either the hypothesis of innocence or the hypothesis of guilt ' ", is insufficient basis for a conviction (*People* v. *Weiss,* 290 N. Y. 160, 163, and cases cited). Guilt in a criminal case must be proven beyond a reasonable doubt and so we are forbidden to apply here the rule in *civil cases* (see *Dillon* v. *Rockaway Beach Hospital,* 284 N. Y. 176, 179) that a judgment may be sustained if we find in the record any evidence which supports the inference on which the decision is based.

FULD, J. (dissenting). I very much fear that this decision of the court may reintroduce some of the confusing uncertainties which the Legislature sought to eliminate from larceny prosecutions some six years ago. Consequently — quite apart from doubts which I entertain as to the sufficiency of the proof establishing the guilt of the defendant Cohen — I cannot concur in the affirmance of the conviction of either appellant, for the reason that the mass of evidence relating to false representations was received at the trial in violation of a controlling statute.

Section 1290 of the Penal Law, as it existed before 1942, defined not a single crime of larceny but three separate and distinct offenses, known as larceny, embezzlement and obtaining property by false pretenses. Each had to be prosecuted by a different indictment or by a separate count of the same indictment, and a vast amount of confusion accompanied the attempt to preserve the identity of each. Indeed, so subtle and nebulous were the distinctions drawn between them that not infrequently one categorically proved a thief was able to escape the consequences of his crime because the prosecutor charged the wrong sort of larceny or the trial judge misconceived the type of theft established. (See, e.g., *People* v. *Noblett,* 244 N. Y. 355; *People*

v. *Dumar,* 106 N. Y. 502; *Zink* v. *People,* 77 N. Y. 114; see, also, *Commonwealth* v. *King,* 202 Mass. 379, 388–390.)

To rid the law of these perplexing refinements and distinctions, the Legislature in 1942 redefined the crime of larceny by completely rewriting section 1290 of the Penal Law (L. 1942, ch. 732). In its preface, the amendatory act declared that it was " the public policy of the state that the best interests of the people of the state will be served, and confusion and injustice avoided, by eliminating and abolishing the distinctions which have hitherto differentiated one sort of theft from another ". By .explicitly rendering " immaterial " the concept of " possession " and " title " in prosecutions for larceny, the Legislature put an end to the legal mumbo-jumbo and to the " very nice " distinctions (*Loomis* v. *People,* 67 N. Y. 322, 329) that had previously plagued prosecutor and court and hindered the effective administration of justice.

The Legislature also added section 1290-a — to regulate the manner of pleading and proof — and it is with that provision that we are concerned. A larceny indictment, it is recited, " shall be sufficient " as long as it charges that the accused, possessing the requisite intent, " stole " property. If, however, it is further specified, " the theft was effected by means of any false or fraudulent representation or pretense, evidence thereof may not be received at the trial unless the indictment  *  *  * alleges such means ".

In the case before us, the indictment, containing 479 separate counts, charged the defendants with the commission of a large number of thefts and forgeries, assertedly connected together and constituting part of a common plan and scheme. The indictment did not contain any allegation of false representation or pretense. Nevertheless, evidence of false representations — which, the district attorney in his opening declared, " duped " the victim's officers — was concededly, and over objection, received at the trial. The question for determination, then, is whether or no the thefts charged against the defendants were " effected " by means of those false representations so as to have required their allegation in the indictment.

Little purpose is to be served by treatment of the evidence. It is sufficient merely to note that the proof indicated, first, that defendants evolved a fairly elaborate scheme which called

for false representations — in the form of faked invoices — to induce certain action on the part of officers of the victimized Mergenthaler Linotype Company, and, second, that it was by means of those faked invoices that defendants contrived to have checks written in such form as best to assure the success of their plan involving the stealing of those checks. There can be no question that the preparation of the invoices, the preparation of the checks to the order of nonexistent firms, the presentation of both invoices and checks to Mergenthaler officers, the signing of those spurious checks by the officers in reliance upon the faked invoices, and under the belief thereby induced that the payees were Mergenthaler creditors — there can be no question, I say, that all of those acts constituted necessary and vital links in effectuating the larcenous scheme ascribed to defendants. Assuredly, the larcenies proved were, in ordinary understanding, " accomplished " or " effected " by means of false and fraudulent invoices and checks. Absent evidence of such false and fraudulent invoices and checks, the People's case would have taken on a completely different aspect; evidence of different acts, of an entirely different scheme, would have been adduced.

It may well be that none of the thefts was consummated until one of the defendants actually placed the fraudulently-inspired check into his pocket; it may well be that each of those thefts was of the type previously denominated a common-law larceny rather than larceny by false pretenses. But to attach operative effect to either one or the other of those circumstances, to insist that the false representations did not " effect " the crime because they did not immediately induce the victim to part " voluntarily " with title to the property, is but to resurrect the ancient confusion: it is merely another way of saying that the theft committed was old common-law larceny rather than larceny by false pretenses. The net effect is to disregard the clearly expressed legislative design and policy that the distinctions between common-law larceny and false pretenses be eliminated and abolished. In other words, if decision as to whether or not false representations need be alleged, is made to depend upon the pre-1942 type of larceny committed, it is evident, I believe, that we would be perpetuating the very hair-splitting distinction between larceny and false pretenses that the new law sought to do away with. It is, of course, no answer

that the attempted distinction is here invoked in favor of the prosecution, for justice to the People demands fairness for the individual.

It cannot be too often repeated or too strongly emphasized that, in enacting the new larceny law, the Legislature declared its aim to be the elimination and abolition of " the distinctions which have hitherto differentiated one sort of theft from another " (L. 1942, ch. 732). Obviously, after providing for their abolition, the Legislature did not mean to continue the distinctions in effect for the purpose of determining whether false representations had to be pleaded in the indictment. That enactment — and the redefinition of the crime of larceny — is as significant as any step toward a more rational criminal procedure. Judges should be alert not to detract from its significance or impair its value. The courts may effectuate and carry out the legislative purpose and thereby assure the nonappearance of technicality and confusion, simply by making certain that those distinctions legislatively eliminated remain eliminated and are not imported anew into larceny prosecutions.

A consideration of section 1290-a of the Penal Law confirms my conclusion. That section requires the allegation of false or fraudulent representations if they aided in the consummation of the theft or facilitated its commission, regardless of what the offense may previously have been called. Whether the People could have established the offenses charged in the indictment without introducing evidence of false representation — whether the case would have been legally sufficient or factually persuasive without such proof — is beside the point. Important and consequential is the circumstance that the statute unequivocally provides that evidence of false representations " may not be received at the trial unless the indictment * * * alleges " them. And, as indicated, the necessity for such allegation is not limited to thefts previously prosecuted under the label, obtaining property by false pretenses; in terms, the statute encompasses every case in which false representations were utilized to " effect " or bring about the theft. Consequently, if the People elect to prove that the thieves made use of false representations to induce certain conduct on the part of their victim, and those representations constituted an integral part of the scheme devised to steal the property — as is the case here — the

theft is one " effected " by those misrepresentations, and the indictment must set them forth.

In my view, therefore, there should be a reversal. The People should determine whether to retry the case on the present indictment — and desist from offering proof of false representation — or to seek a new indictment alleging the essential false representation and pretense.

I would reverse the judgments and order a new trial.

CONWAY, THACHER and DYE, JJ., concur with LEWIS, J.; DESMOND, J., concurs in separate opinion as to defendant Lobel but dissents and votes to grant a new trial as to defendant Cohen; FULD, J., dissents as to both defendants in an opinion in which LOUGHRAN, Ch, J., concurs.

Judgments affirmed. [See 298 N. Y. 920.]