Scileppi, J.
In 1962, defendant was convicted of felony murder, murder in the second degree, and arson in the third degree. He was sentenced to life imprisonment on the felony murder count, to a concurrent term of 40 years to life on the second degree murder count, and to a term of 10 to 20 years as a prior felony offender on the arson count, to run consecutively with the other two terms. The Appellate Division modified, striking out the sentence of 40 years to life for the murder in the second degree. As so modified, the judgment below was unanimously affirmed. The Appellate Division reasoned that “ it was improper to impose an additional sentence in respect of the crime of murder in the second degree committed by the same act which resulted in the conviction for murder in the first degree ” (20 A D 2d 899, 900).
Both the People and the defendant appealed, pursuant to permission of an Associate Judge of this court. This case was decided with People v. Huntley (15 N Y 2d 72). Accordingly, we withheld determination of the appeal and sent the case back to the Supreme Court, Nassau County, for a “ Huntley ” hearing (15 N Y 2d 723), which has been held. The Trial Judge found the defendant’s confession voluntary beyond a reasonable doubt. The Appellate Division affirmed, and from the amended judgment of the Appellate Division defendant appeals.
Our attention is directed to two questions: first, whether the issue of voluntariness of the confession herein was properly resolved; second, whether the original sentence imposed should be reinstated.
At about 3:25 p.m. on the day in question, Patrolman Robert La Vigne, of the Nassau County Police Department, received a call to assist at a fire in Manorhaven, Long Island. From his position on the fire line, he observed the defendant light a cigarette, drop it to the ground, step on it, light another, take several puffs, drop it to the ground, step on it, pace back and forth, glance at the burning house, glance at the crowd, and pace back and forth again. In addition, he testified that defendant was running his fingers through his hair. The patrolman *387 approached the defendant and learned that he was a hoarder in the burning bnilding. The defendant gave the patrolman his name and produced a mutilated Social Security card as identification. After several questions were propounded to the defendant, he became “ aggressive ” and the patrolman stated “ I said that I didn’t like the fact that he couldn’t identify himself and that I was holding him for questioning when the detectives arrived”. The time was about 3:45 p.m. Shortly thereafter, the badly mutilated body of Mrs. Evelyn Williams was discovered within the burning building. Detective Rodgers of the Arson Squad arrived at the scene at about 4:00 p.m., conducted an investigation, found 10 unrelated fires, and detected an odor of kerosene. Detective Stark was ordered to take the defendant to the precinct station house at about 5:20 p.m. While the defendant was at the precinct, Lieutenant O’Shea searched the area of the fire and discovered several articles of male clothing in a trash can. These articles were examined and tested by the police laboratory and were found to be bloodstained. The detectives then proceeded to the restaurant where the defendant had been employed. The proprietor of the establishment, when shown the clothing, identified the articles as defendant’s. The police then drove to the precinct where, at about 10:00 p.m., the clothing was shown to the defendant who acknowledged that most of the clothes were his.
Also around 10:00 p.m., Detective Stark noticed some stains on the defendant’s undershirt, visible through a slight opening in his outer shirt. The detective asked the defendant if the police could have the undershirt for testing, and the defendant consented. In addition, the defendant had previously voluntarily turned over to the police the contents of his pockets, including a bloodstained $10 bill.
The findings of the court below continue the narration as follows;
“ Throughout the interrogation by numerous police personnel, the defendant denied his guilt. He was allowed to smoke, use the bathroom, and was served coffee and sandwiches intermittently during the examination, whieh continued past midnight and into the early morning of May 17th. The defendant was questioned continuously, without sleep, by a number of police officials * * * alone and in teams. During the period of *388 detention, tlie defendant also willingly gave to tlie police, all or most of tlie clothes lie was wearing when apprehended. These articles were delivered to the Police Laboratory for testing.
“Some time after 2 a.m. Detective Jones, who had been attending at the autopsy on the deceased, entered the room where Leonti was being questioned. Detective Stark left shortly thereafter and Detectives Jones and Kenny continued their questioning of the defendant. At approximately 3:45 a.m. the detectives ‘ started fight from the beginning again ’. A discrepancy arose in defendant’s story when he was asked to explain the presence of blood on certain items of clothing which had been found at the scene of the homicide and which the defendant had previously identified as his own. At that point, the defendant said ‘ I might as well tell you, you are going to keep asking me * * * until I do.’
“ The defendant admitted that he had been lying up to that point and then proceeded to narrate the events of the day, detailing the particulars of the slaying. Detective Jones reduced this information to a written narrative form. At approximately 6:30 a.m. the written statement was read aloud to Leonti who thereupon signed it.
‘ ‘ After signing the 9-page written statement, defendant was then interviewed by an assistant district attorney from 6:55 a.m. until 7:25 in the presence of two other assistants and two detectives. The questions and answers which followed were recorded by a stenographer. The defendant’s condition at this hour, after having been interrogated all night, was described by Detective Jones as ‘ wide awake ’ and ‘ had his full facilities ’ and by Detective Kenny as not appearing to be tired.
“ After the interview by the district attorney had been concluded, Leonti was asked to sign certain additions which were made to the statement at 9:20 a.m. and again at 10 :50 a.m. Shortly thereafter the defendant was arraigned in the Nassau County District Court on the first degree murder charge and then was received at the county jail at about 11:50 a.m. on May 17 th.
“ When Leonti arrived at the jail he was in the custody of Detective Kenny and another detective. He made no complaint of any injuries. On the following morning of the 18th, in the course of his duties as jail doctor and according to the practice *389 of examining every newly-admitted prisoner, Dr. Alexander Yivona examined Leonti. When asked by the Doctor if be bad anything- wrong, Leonti replied in the negative. A few minutes later, however, he claimed that he had been beaten by detectives with their fists at about 4 a.m. on May 17th. He also complained of pains in the stomach and chest. In the examination that followed, the doctor said he found contusions and abrasions of the upper abdomen and anterior chest, as well as contusions of the left thigh. The injuries were characterized as being of ‘ recent origin ’. There were no black and blue marks or discoloration on defendant’s body. The only objective symptoms of the injuries complained of were some superficial, lateral scratches which could have been self-inflicted and such as might be produced by one’s scratching himself. The only evidence of any contusions were defendant’s complaints to Dr. Yivona of pain, clearly subjective symptoms. There was no discoloration, just complaints of tenderness on palpation. Defendant was not disheveled, was not struck and made no complaints of injury or of being struck, except to the doctor ”.
In an appeal to this court, we have limited jurisdiction to pass on factual determinations affirmed by the Appellate Division. Since our determination in People v. Huntley (15 N Y 2d 72, supra), the rule has been that the Trial Judge must determine, beyond a reasonable doubt, that the confession is voluntary before that selfsame issue is submitted to the trial jury. Thus, in any case, whether pre- or post-Jackson v. Denno (378 U. S. 368; see Huntley, pp. 77-78), the validity of the Trial Judge’s determination of the question of voluntariness must be measured by the same standards applicable to a verdict of guilt.
Thus, the question whether the evidence adduced meets the standard required is one of law for our review. In People v. Ledwon (153 N. Y. 10, 16) we said: “ If the record in this court shows either that there was no evidence whatever, or that the evidence did not, as matter of law, come up to the standard which the law requires in quantity and quality to warrant ” the finding of guilt, this court has the power to acquit.
The evidence in the present case pointing to voluntariness (e.g., affirmative testimony by the police that defendant was not maltreated; was, in fact, fed by the police; was permitted to smoke and use the toilet; co-operated with the police, .at least *390 to the extent of consenting to having certain items subjected to analysis and identifying, as bis own, certain clothing found at the scene of the crime; and that defendant changed his story and confessed after the mounting tangible evidence of his guilt had been gathered by the police) certainly meets any qualitative or quantitative test. None of the evidence recited in the dissenting opinion herein — -while raising an issue of fact, that its, demonstrating that conflicting inferences might be drawn from the record — destroys the sufficiency of the evidence leading to a finding of voluntariness (see People v. Oyola, 6 N Y 2d 259, 261). Taking this view, the dissenter is, in our opinion, reviewing a question of fact, i.e., whether the confession was or was not voluntary. This we cannot do (N. Y. Const., art. VI, § 3). People v. Lobel (298 N. Y. 243) and People v. Pesky (254 N. Y. 373) supply the guiding principle that, where there are conflicting inferences to be drawn from the proof, the choice of inferences is for the trier of the facts. And that choice is to be honored unless unsupported, as a matter of law (see, also, People v. Porcaro, 6 N Y 2d 248, 256-257 [Burke, J., dissenting]).
People v. Barbato (254 N. Y. 170) and People v. Valletutti (297 N. Y. 226 [see dissent in People v. Cerullo and Moccio, 18 N Y 2d 839, 842]) merely reiterate the rule that we may reject a finding of voluntariness only where such a finding is premised on clearly insufficient evidence. In Barbato and Valletutti, the insufficiency of the evidence of voluntariness was shown by the existence of unexplained objective evidence of violence upon the person of the defendant.
Perhaps the strongest piece of evidence sustaining the claim that the confessions were involuntary is the testimony of the Nassau County Jail physician. But the weight to be attached to Dr. Vivona’s testimony was entirely up to the trier of the fact. While it is generally true that a prompt outcry is some evidence of the truth of allegations of police brutality (People v. Alex, 260 N. Y. 425), Dr. Vivona himself indicated that the visible evidence on Leonti’s body could well have been self-inflicted and that the subjective outcries upon palpation may or may not have been feigned. In addition, the examination by Dr. Vivona occurred some 24 hours after Leonti’s arraignment. While it may very well be that the doctor was the first person to whom Leonti . reasonably could have complained about police mal *391 treatment, we note that the passage of time between arraignment and examination by Dr. Vivona was sufficient for Leonti to concoct both his story and the physical evidence of brutality. Or, to put it another way, the complaint of police brutality and the evidence tending to lend some credence to that complaint is not necessarily credible. The choice of whether to believe the story of brutality or not was up to Judge Fabley. His finding clearly indicates that he chose not to credit this evidence, and we cannot say that he was wrong as a matter of law.
As for the other objections to Judge Fabley’s findings, suffice it to say that we treat the background of the defendant; the time, place and length of interrogation; the presence or absence of a request for or warning of the defendant’s right to counsel; ignorance of right to remain silent and complaints of brutality as relevant factors to be considered on the question of volun-tariness, leaving the determination of the “ultimate issue” to the trier of the fact and restricting ourselves to the question of the sufficiency of the evidence (e.g., People v. Hill, 17 N Y 2d 185, 190; Cohen and Karger, Powers of the New York Court of Appeals, pp. 742-745; Richardson, Evidence [9th ed., Prince], pp. 320-327). The evidence was considered in great detail by both the trial jury and the Trial Judge, and we have no basis in the present record for overturning their factual determination. Of course, Miranda v. Arizona (384 U. S. 436) is of no assistance to defendant (People v. McQueen, 18 N Y 2d 337).
Finally, the People argue that the sentence for murder in the second degree should be reinstated. The defendant, however, contends that the verdict is defective because he was convicted of murder in the second degree which requires intent, and felony murder which does not require intent. The specific error alleged by the defendant is that he may not be convicted of murder in the second degree under an indictment for felony murder. But in this ease the indictment contains a count charging common-law murder, and a separate count of felony murder. Therefore, the conviction of murder second degree is proper as a lesser included crime under the common-law murder count. People v. Hoffman (219 App. Div. 334, affd. 245 N. Y. 588), relied upon by the defendant, is distinguishable on the ground that the court there was concerned with an indictment containing only one count of felony murder. This jury could find the *392 defendant guilty under both, counts by determining that the homicide occurred during the commission of a felony, and also that the defendant intended to kill the victim. (See People v. Luscomb, 292 N. Y. 390, 398 [stating that an intent to kill during the course of a felony does not take the case out of the felony murder category].) The convictions on both counts are proper (see People ex rel. Maurer v. Jackson, 2 N Y 2d 259, 264 [where the court recognizes that a single act may violate more than one statute]).
The defendant was sentenced to 40 years to life on the conviction of murder in the second degree, and to a concurrent life term of imprisonment oil the conviction of felony murder. Since these sentences are to run concurrently, section 1938 of the Penal Law is not violated because the two concurrent sentences constitute a single punishment (People ex rel. Maurer v. Jackson, 2 N Y 2d 259, supra). Therefore, the Appellate Division modification of the sentence is improper and the sentence of the trial court with respect to the conviction of murder in the second degree should be reinstated.