87 N.Y.2d 477 (1996)
663 N.E.2d 607
640 N.Y.S.2d 451
The People of the State of New York, Appellant-Respondent,
v.
Jeffrey Damiano, Respondent-Appellant.
Court of Appeals of the State of New York.
Argued October 26, 1995
Decided January 16, 1996.
Michael Kavanagh, District Attorney of Ulster County, Kingston (Joan Gudesblatt Lamb of counsel), for appellant-respondent.
Paul J. Connolly, Albany, for respondent-appellant.
Chief Judge KAYE and Judges SIMONS, TITONE and SMITH concur with Judge CIPARICK; Judge SIMONS concurs in a separate concurring opinion; Judge LEVINE concurs in Judge CIPARICK'S opinion on the defendant's appeal and in result on the People's appeal on constraint of People v Spivey (81 N.Y.2d 356) and People v Kelly (76 N.Y.2d 1013); Judge BELLACOSA dissents only on the People's appeal in a separate opinion.
*480 CIPARICK, J.
CPL 310.20 (2) provides that jurors may take a "written list prepared by the court containing the offenses submitted to the jury by the court in its charge and possible verdicts thereon" into the jury room when they conduct their deliberations. When the jury requests further instruction regarding the statutory definition or elements of a charged offense, CPL 310.30 allows the court, with the consent of the parties, to provide the jury with a copy of the text of the statute. We have consistently held that when counsel does not consent, it is reversible error for the court to provide the jury with a verdict sheet that contains statutory text or lists elements of the crimes charged in the indictment (see, People v Spivey, 81 N.Y.2d 356; People v Johnson, 81 N.Y.2d 980; People v Taylor, 76 N.Y.2d 873; People v Kelly, 76 N.Y.2d 1013; People v Nimmons, 72 N.Y.2d 830; People v Sanders, 70 N.Y.2d 837). The primary issue, presented by the People's appeal, is whether, in the absence of the parties' consent or an objection by counsel, it is reversible error for the court to provide the jury with a verdict sheet that contains statutory elements or terms of the charged murder offense. The Appellate Division correctly applied our precedents by concluding that this was reversible error. We therefore affirm.

*481 Factual Background
According to the People's evidence, on April 21, 1991, defendant and two friends positioned themselves on the Freetown Road overpass on the New York State Thruway in New Paltz and hurled rocks down upon the cars travelling on the Thruway. The three then repositioned themselves on the South Ohioville overpass, where defendant and one of the friends, Eric Birdsall, lobbed rocks they described to be the size of tennis balls into the traffic 24 feet below, hitting cars driven by James Carroll and Keith Dibble. In their final and fatal act, defendant and Birdsall heaved a 52-pound boulder down upon the on-coming traffic, smashing the car driven by 22-year-old Karen Zentner. She was killed instantaneously. A jury convicted defendant of murder in the second degree for the death of Zentner, as well as reckless endangerment in the first degree for creating a grave risk of death to Carroll and reckless endangerment in the second degree for creating a grave risk of death to Dibble. Defendant was sentenced to concurrent terms of 20 years to life on the murder count, 2 1/3 to 7 years on first degree reckless endangerment count and one year for the second degree reckless endangerment offense.
The Appellate Division modified the judgment by reversing the conviction on the murder count based on the trial court's error in submitting a verdict sheet to the jury which parenthetically listed elements of the crime of murder in the second degree and the lesser included offense of manslaughter in the second degree charged under the first count, and remitted for a new trial on the murder count, and otherwise affirmed (see, People v Damiano, 209 AD2d 873). A Judge of this Court granted the People leave to appeal and defendant leave to cross-appeal.

I

The People's Appeal
The People argue that the Appellate Division erred as a matter of law in reviewing defendant's unpreserved claim that the trial court committed reversible error by submitting an annotated verdict sheet to the jury, which, defendant alleges, compromised his right to a fair trial (see, People v Cona, 49 N.Y.2d 26, 34). The People concede that the annotated verdict sheet was improper, but contend that a proper objection was a prerequisite to reversal on this basis. The People insist that defendant's failure to register any objection to this verdict *482 sheet renders his belated challenge not only unpreserved for appellate review, but actually constitutes implicit consent to the annotated verdict sheet, a contention embraced by the dissent. We disagree.
The "statement of charges" submitted to the jury lists the first count as "murder in the second degree" and on the succeeding line is the parenthetical reference "depraved mind murder." The lesser included offense is set forth in the alternative on the next line and reads "if not guilty, manslaughter in the second degree," followed by the parenthetical reference "reckless manslaughter" on the subsequent line. Without the parties' consent, these explanatory parentheticals which refer to depravity and recklessness  elements of the crimes charged pursuant to count one of the indictment  offend the letter of the law (see, CPL 310.30; see also, CPL 310.20 [2]).
As our precedents establish, we strictly construe the express, unambiguous statutory language that the court may only furnish an expanded or supplemental verdict sheet "with the consent of the parties," and tolerate nothing other than a "statement of charges." (CPL 310.30; see, People v Spivey, 81 N.Y.2d 356, supra; People v Johnson, 81 N.Y.2d 980, supra; People v Kelly, 76 N.Y.2d 1013, supra; People v Nimmons, 72 N.Y.2d 830, supra; People v Owens, 69 N.Y.2d 585, 590.)[1] In accordance with this provision, we have held that the submission, over counsel's objection, of selected portions of statutory text or the text itself constitutes error as the nature of the jury's role is fact finding, not interpretation of the applicable legal terms (see, People v Owens, 69 NY2d, at 591, supra; People v Taylor, 26 NY2d, at 874, supra). As a general matter, any potential prejudice to the deliberative process arising from the jurors' consideration of statutory material cannot be evaluated because there is no record of their deliberations (see, People v Owens, 69 NY2d, at 591, supra; see also, Schwarzer, Communicating with Juries: Problems and Remedies, 69 Cal L Rev 731).
CPL 310.30 demands the parties' consent to references to statutory terms or elements on a verdict sheet, for it is trial *483 counsel who are best positioned to assess the usefulness of such references in the deliberative process and/or the prejudice that may inure therefrom. CPL 310.30, together with our interpretive jurisprudence, collectively the "doctrinal underpinning" decried by the dissent, delineates the procedures to handle jury requests and the scope of statutory material appropriately provided to a jury (see, e.g., People v Moore, 71 N.Y.2d 684, 688; People v Mehmedi, 69 N.Y.2d 759, 769, rearg denied 69 N.Y.2d 985; People v Nimmons, 72 N.Y.2d 830, supra; People v Sanders, 70 N.Y.2d 837, supra; People v Owens, 69 N.Y.2d 585, supra; see also, People v Tucker, 77 N.Y.2d 861). These procedures devolve from the recognized decisive function of jury deliberations, the critical role materials taken into the jury room can play in the deliberative process, and the fact that trial counsel is best equipped to assess the value of materials provided to the jury which are not expressly authorized by statute (see, e.g., People v Young, 79 N.Y.2d 365; People v Sotomayer, 79 N.Y.2d 1029; People v Taylor, 76 N.Y.2d 873, supra; People v Brooks, 70 N.Y.2d 896; People v Owens, 69 N.Y.2d 585, supra).
Thus, when the court determines that listing statutory elements or terms of the crime  whether as labels or a shorthand for statutory text  on the verdict sheet will aid the jury in their deliberations, the court must permit counsel to review the annotated verdict sheet and obtain counsel's consent prior to submitting it to the jury. This will ensure compliance with the statutory mandate of CPL 310.30, and the "consent of the parties," contemplated both by CPL 310.30 and our decisional authority (see, People v Spivey, 81 NY2d, at 361-362, supra; People v Sotomayer, 79 NY2d, at 1030, supra; People v Taylor, 76 N.Y.2d 873, supra; People v Nimmons, 72 N.Y.2d 830, supra; People v Sanders, 70 NY2d, at 838, supra). In addition, it provides documentation on the record. Likewise, an objection, where advised, could be recorded (see, People v Johnson, 81 NY2d, at 982, supra; People v Kelly, 76 N.Y.2d 1013, supra; People v Brooks, 70 NY2d, at 897, supra; People v Owens, 69 NY2d, at 591, supra), preempting the speculation precipitated by a silent record. In this regard, we commend the practice of counsels' initialing the verdict sheet after the trial court presents it for their review.
That the dissent deems rejection of the annotated "statement of charges" in this case a "theoretical flaw," based on its belief that the Trial Judge's intentions were benign  aimed at assisting the jury  and its perception that there was no risk that the jurors would misconstrue or reinterpret the parenthetical *484 statutory references, simply ignores the patent statutory violation uniformly repudiated by our precedents. Innocuous though the labels may look, especially in appellate hindsight, there is no room for selective definitional terms or labels comprised of statutory text where consent of the parties is lacking.
Under the circumstances reflected in this record, the lack of an objection to the annotated verdict sheet by defense counsel cannot be transmuted into consent, as the People and the dissent argue. Rather, a fair and unadorned reading of the record reveals that after the jury sent two notes requesting reiteration of the definition of the charges in the case, the court, in the presence of defendant, his counsel and the prosecutor, repeated the charges and twice indicated its intention to submit a "statement of charges" to the jury to assist in the deliberations. The record is barren of any colloquy pertaining to the court's presentation of the "statement of charges" to the parties or a recitation of the substance of the verdict sheet. In fact, there is not even a transcript reference recording the court's actual submission of the verdict sheet to the jury; the verdict sheet simply contains the marking "Court Exhibit 4." It is the People who bear the burden on this appeal of demonstrating what the record reflects; their failure to satisfy this burden cannot be overcome by the dissent's reading of the record, which would work to defeat the clear statutory command.
Notwithstanding the dissent's proposed reconstruction of the sequence of notes emanating from the jury's deliberations hypothesizing when the annotated "statement of charges" was submitted, we will not engage in appellate speculation to recreate what the record simply does not reflect or suggest. It is not the function of appellate courts to elevate "inescapable inferences" to fact, rather we accord the facts contained in the record their due. Thus, just as appellate ruminations cannot change the fact that there is no officially marked Court Exhibit 1 or dispel the possibility that Exhibits 4 and 5 were marked simultaneously, we cannot construe defense counsel's silence as the equivalent of consent to the annotated verdict sheet on this record. Nor is there any force to the dissent's suggestion that the Trial Judge, by twice promising that a "statement of charges" would be forthcoming, put defense counsel on notice sufficient to compel a prospective objection; an appellate court cannot presume defense counsel should have guessed that the "statement of charges" would contain annotations.
Finally, we reject the dissent's attempt to seek refuge in harmless error as an alternative approach to abrogate the *485 statutory mandate, and diminish the cogency of our decisions strictly construing this provision.[2] The submission of the annotated verdict sheet, not consented to by counsel, cannot be deemed harmless (see, People v Owens, 69 NY2d, at 592, supra; People v Wood, 66 N.Y.2d 374, 379; see also, People v Sanders, 70 NY2d, at 838, supra). We cannot assess the effect of these annotations on the deliberative process; the dissent's suggestion  based on the jurors' note that tracked the first parenthetical reference on the verdict sheet  that these circumscribed labels simplified or clarified the charges is pure conjecture. The repeated requests for reiteration of the same charges is just as likely attributable to confusion. As any attempt to evaluate the impact of these annotations is necessarily predicated on speculation about the thought processes of the jurors, a harmless error analysis is inappropriate (see, Klein v Harris, 667 F.2d 274, 291; see also, People v Kelly, 76 NY2d, at 1014, supra). The empirical verification of the efficacy of our interpretation of CPL 310.30 is a matter the Legislature is appropriately charged with addressing.
Accordingly, we conclude that it was reversible error for the trial court to submit the annotated verdict sheet to the jury without the consent of counsel, and defendant is entitled to a new trial on the murder count.

II

Defendant's Cross Appeal
Defendant's principal contention is that the courts below erred in failing to suppress statements he made to the State Trooper who transported him to court for arraignment. Defendant vigorously objects to the suppression court's finding that his remarks were spontaneous.
The suppression court opined that defendant voluntarily followed police investigators in his own car to the police barracks. Five minutes after he was shown to an interview room, *486 two investigators introduced themselves to defendant, advised him of his Miranda rights and indicated they wanted to talk with him about the Zentner homicide (see, Miranda v Arizona, 384 US 436). Defendant did not decline to talk, nor did he request counsel. Approximately two and one-half hours later, defendant described what happened on the night Zentner was killed, which statement was reduced to a writing signed by defendant. Not until after he signed the statement did defendant ask to call his mother, who instructed him to say nothing to the police and advised him that she would secure an attorney. Thereafter, defendant refused to cooperate and would not agree to visit the crime scene.
An hour and a half after defendant's conversation with his mother, a different officer not connected with the homicide investigation was directed to transport defendant to court for arraignment. The direct route to the court passed the crime scene. Upon the officer's approach to the South Ohioville overpass, defendant emitted a sigh, prompting the officer to query "what's up." The suppression court ruled that defendant's ensuing remarks explaining his involvement in the Zentner homicide were "completely spontaneous" and admissible. The suppression court held that the statements were admissible "irrespective" of whether the transporting officer knew the attorney secured by defendant's mother had "entered the picture," an allegation the court found was never established.
The Appellate Division affirmed, stating that "where, as here, defendant was being escorted to the arraignment by an officer unfamiliar with the circumstances of the investigation and the significance of the South Ohioville overpass, we cannot say that the [suppression court] was in error in determining that defendant's statements were spontaneous and not triggered by conduct which reasonably should have been anticipated to evoke such declarations" (People v Damiano, 209 AD2d, at 874, supra).
This undisturbed finding of spontaneity, which is factually supported on this record, limits our review power (see, People v Rivers, 56 N.Y.2d 476, 480, rearg denied 57 N.Y.2d 775; People v Lynes, 49 N.Y.2d 286, 294; People v Leonti, 18 N.Y.2d 384, 389, cert denied 389 US 1007). Unless there is no possible view of the evidence that would support the determination of the lower courts, we are bound by the finding of the suppression court (see, People v Leonti, 18 NY2d, at 389-390, supra). Here, we cannot say, as a matter of law, that defendant's statements were the subject of any improper elicitation by the *487 transporting officer as would cast doubt upon the finding of genuine spontaneity. Defendant was not obligated to respond to the officer's innocuous, nonprovocative question in any manner. Neither his right to counsel nor his right to remain silent was abridged, and there is no basis for disturbing the affirmed finding.
Defendant's further claim that it was error for the trial court to send the 52-pound boulder into the jury deliberation room pursuant to their written request without first advising defendant and counsel is specious. CPL 310.20 (1) provides that upon retiring to deliberate, jurors may take with them "[a]ny exhibits received in evidence at the trial which the court, after according the parties an opportunity to be heard upon the matter, in its discretion permits them to take."
The 52-pound boulder was received in evidence after defense counsel had an opportunity to voir dire the investigator who retrieved the boulder from the back of Zentner's crushed automobile. The trial court overruled counsel's sole objection, which was directed to the chain of custody, not to any prejudice the physical presence of the boulder might cause. It is uncontroverted that the boulder was present in the courtroom for the jury to view throughout the trial and was repeatedly referred to during the trial testimony of the investigator who recovered it from the car and during the summations.
At the conclusion of the trial, the court, exercising the discretion accorded it pursuant to CPL 310.20 (1), advised the jury that all exhibits, other than one or two received for limited purposes, would be available for inspection in the jury deliberation room. The final portion of the court's charge instructed the jury that the exhibits would not automatically be sent into the jury room but upon their request would immediately be provided. The court then excused the jury to hear any exceptions and additions to the charge. Defense counsel did not object or request any supplemental instruction regarding the boulder (see, CPL 310.20 [1]). Therefore, when the jury sent a note requesting the boulder, it was not error for the trial court to provide the boulder to them (see, People v Moore, 71 NY2d, at 686-687, supra).
Defendant's reliance on People v O'Rama (78 N.Y.2d 270) is misplaced. The note sent by the jury simply requested the boulder, which both the jury and counsel were apprised was available for inspection upon request; the note did not request any substantive information to implicate the notice procedures outlined in O'Rama. Indeed, other than the production of the boulder, the note called for no other response.
*488 Defendant's remaining contentions are devoid of merit.
Accordingly, the order of the Appellate Division should be affirmed.
SIMONS, J. (concurring).
I concur fully in Judge Ciparick's opinion to affirm. I write separately only to address the dissent.
The statutes regulating submissions to deliberating juries (CPL 310.20, 310.30) were enacted in 1970. In the last eight years we have construed and applied them at least nine times, holding in each case  except one dealing with delivery to the jury of a copy of the indictment (People v Moore, 71 N.Y.2d 684)  that furnishing materials to the jury without the consent of counsel was error. These decisions were unanimous with little discussion required. One can only marvel, therefore, at a dissent, written by a Judge who joined in all of those decisions, which takes this Court, as well as the Appellate Division, to task for following them and urges that the two most recent ones should be overruled. The arguments advanced for doing so fail to overcome the demands of stare decisis or recognize the need to maintain the legitimacy of the Court's decision-making process.
Stare decisis is the doctrine which holds that common-law decisions should stand as precedents for guidance in cases arising in the future, that a point of law, once decided by a court, will generally be followed in subsequent cases presenting the same legal problem. The doctrine rests upon considerations of practicality and principle.
From a practical viewpoint, it cannot be seriously argued that a court should reexamine every relevant precedent that has gone before. It could hardly do its work if it did so. As Justice Cardozo put it:
"[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him" (Cardozo, Nature of the Judicial Process, at 149).
As a matter of principle, stare decisis is accepted for two reasons. First, following precedent enhances stability in the law because the failure of a court to settle on a rule invites perpetual attack and reexamination, with the real possibility *489 that governing rules will change whenever the composition of the Court changes. It is rare that all members of the Court fully agree on a particular subject and it is more important that there be a predictable rule to govern conduct than that the rule be "right" (see, Burnet v Coronado Oil & Gas Co., 285 US 393, 406 [Brandeis, J., dissenting]). Any other course can lead to anarchy as trial courts and intermediate appellate courts, who must apply the law as we declare it, speculate on what our latest view on the subject will be. For this reason alone, Judges have an institutional obligation to respect the doctrine and abide by it (see, Robbins v California, 453 US 420, 436, n 4 [Powell, J., concurring]; see also, Planned Parenthood v Casey, 505 US 833, 854-869). Moreover, the reiteration of arguments against the rule after they have been considered and rejected several times permits an unwarranted inference by the Bar and public that those rules remain open to debate.
Further, and most importantly, stare decisis is a rule of legitimacy. Courts, unlike the other two branches of government, do not derive their authority by electoral mandate and they are not expected to respond to the popular will or public emotions. Indeed, their influence rests in large part upon the understanding that unelected Judges are motivated by principle and that they exercise their power evenhandedly, setting aside personal views and extraneous influences to follow precedents and develop the law in an ordered fashion. The concept of legitimacy is fundamental to the exercise of judicial power, for the courts have little to compel adherence to their decisions except the respect accorded to them by the public borne of the integrity of the decision-making process. A high court which uniformly adheres to its prior interpretation of a statute in a line of cases only to reconsider those precedents and overrule them in a legally indistinguishable but factually egregious case will surely and deservedly lose its credibility and provoke serious questions about the legitimacy of its processes.
Stare decisis is not an inflexible doctrine, of course, and rules long settled but not recently revisited are always open to reexamination if there is some evidence that the policy concerns underlying them are outdated or if they have proved unworkable (see, People v Bing, 76 N.Y.2d 331; People v Hobson, 39 N.Y.2d 479).
There is nothing outdated, however, about the rule under consideration here. It was formulated by the Legislature, not this Court, and remains a part of our statutory law. We merely *490 interpreted the statute and applied it to the cases before us. There is no evidence that our interpretation is contrary to the legislative purpose underlying the statute, that it is unworkable or that, when properly applied, it imposes any hardship on litigants or the trial courts. Though some may disapprove of the statute (indeed, the court system itself has invited proposals for legislative reform of the rule),[*] it remains in force without any apparent disposition by legislators to amend it. We may assume from this that the Legislature agrees with our interpretation. If it did not it could have amended the statute long ago. Certainly, that opportunity remains available now.
To justify its suggestion that we should overrule recent precedents, the dissent relies upon People v Hobson (39 N.Y.2d 479, supra), the errant footstep case, and People v Bing (76 N.Y.2d 331, supra). Those cases involved constitutional issues, an area in which a court may more readily consider change, and in some cases must necessarily do so, because the judicial rules are immune from legislative correction. The rule here criticized by the dissent rests upon our interpretation of a statute. There may be cases in which the Court has overruled its own prior interpretation of a statute, but I cannot recall any. The reason why such decisions are rare is obvious. If the Court is wrong in its interpretation of a legislative enactment, the Legislature can readily correct the statute to make its meaning clear.
Finally, there is no hardship in applying the rule before us. It requires only that the court show the verdict sheet to defense counsel and obtain his or her consent to deliver it to the jury. The record fails to show that the trial court did so in this case and it is not for us, an appellate court, to go outside the record and speculate on whether counsel knew of this annotation on the verdict sheet and failed to preserve his claim or if he was unaware that the sheet had been annotated. Nor is it legitimate for us to change the rule so that the trial court's failure to abide by it may be deemed correct.
BELLACOSA, J. (dissenting in part).
A theoretical flaw on the written "statement of charges" given by the Trial Judge to help the jury sort out its verdict choices in this case is allowed to nullify an otherwise fair trial that resulted in a valid murder conviction. Defendant Damiano does not deserve a new *491 trial, and the law of the State of New York on verdict sheets should not compel this miscarriage of justice.
The Trial Judge exhibited a keen awareness of the limitations of the rules governing materials that can be given to assist a deliberating jury. He openly expressed his inability to give the jury helpful written material after correctly, fully and repeatedly instructing the jury orally. Nevertheless, the jury's finding of guilt is ironically overturned because an authorized verdict sheet contained a parenthetical set of five demonstrably nonprejudicial, legally innocuous words, i.e., "depraved mind murder" and "reckless manslaughter." Because the pertinent judicial interpretations, derived from statutes, should be either applied more realistically or readjusted, I respectfully dissent.
Judge Ciparick's opinion recites the salient facts depicting the random and fatal violence of this case. After an eight-month investigation, defendant Damiano and two other culprits were identified and caught. All three confessed and were prosecuted.
Only Damiano, who was convicted after a jury trial (whose fairness is not contested here), is now before this Court on cross appeals by the People and himself. The Court is unanimous that his appeal as to the voluntariness of his admissions to the police lacks merit. The People's appeal from the Appellate Division order directing a new trial on the murder conviction, on the other hand, divides the Court. The interpretation of the original file, the procedural rubrics, and a realistic, objective appraisal of a legal principle and its snowballing application are the valid points of difference.[1]
The defendant argued in the Appellate Division that his trial counsel was "apparently" not afforded an opportunity to object to a verdict sheet given to the jury by the Trial Judge during deliberations, and that "it does not appear" that defense counsel had notice of the verdict sheet at all. Appellate defense counsel argued that despite the absence of any defense requests or objections, even after two timely open court notifications, the trial court committed per se reversible error.
In an effort to aid the jury's work and pursuant to authority expressly invested in trial courts by the Legislature (see, CPL *492 310.20 [2]), the Trial Judge gave the jury a checklist of the alternative charges to be considered. The sheet was a menu of the charged crimes of the indictment and certain lesser included counts. The sheet correctly distinguished the top murder charge from the lesser included offenses of manslaughter and criminally negligent homicide in two relevant particulars as follows:
"1st Count>MURDER IN THE SECOND DEGREE
(Depraved Mind Murder)
if not guilty>MANSLAUGHTER IN THE SECOND DEGREE
(Reckless Manslaughter)
if not guilty>CRIMINALLY NEGLIGENT HOMICIDE" (officially marked Court's Exhibit 4 [emphasis added]).
These parentheticals are the whole essence of this controversy and case, and the sole basis for the grant of a new trial on the homicide count.
The overwhelming evidence of guilt in this case renders it inconceivable that the jury was wrongly swayed by the parenthetical expressions, especially in light of the trial court's meticulous explanations of all the elements of the crimes. To persuade anyone of the potential danger or actuality of prejudice, one would have to show and believe that the jury, upon seeing the few parenthetical words on the verdict sheet, decided to ignore the court's explicit instructions on second degree murder and proceeded to concentrate only on whether the defendant had a depraved mind. This theory is unrealistic and unfair to the facts and participants, including the Trial Judge and jurors. It also fails to take account of common sense and the experience and problems of all levels of courts engaged in the continuing struggle to deal with the dynamic interplay between jury instructions and jury deliberations.
The Trial Judge's intentions to submit a verdict sheet, expressed in defendant's and defense counsel's presence, could not be more plain:

*493 "THE COURT: Incidentally, I will submit a statement of the charges and the lesser included charges which might assist you here" (emphasis added).
After further, thorough, oral reinstructions on the criminal elements as requested by the jury, the Trial Judge again declared:
"THE COURT: I'll send you a statement of the charges which I hope will assist you. We are here to help you and as I said it's unfortunate I just can't give you a transcript of this for your ready reference but I can't. All right, you may retire to your deliberations" (emphasis added).
Moreover, the Trial Judge in this case instructed the jury repeatedly on the particularized elements earmarked by the parenthetical labels. Although the oral instructions had the advantage of having been communicated with full explanations of each of the crimes, the case nevertheless collapses under the weight of a rule that neutralizes, and even obliterates, all of the concededly correct instructions and efforts (contrast, People v Knight, 87 N.Y.2d 873). Once a jury sees any written words that are presented more fully in the customary and regular oral instructional form, a fiction is superimposed that its powers of reason and faithful responsiveness are suspended and it is deemed to have deliberated in an irretrievably "skewed" process.
This dissenting approach includes three principal facets relating to the application of this Court's lines of precedent to the present situation. First, I urge consideration of prejudice as a factor before convictions arrived at after eminently fair trials are reflexively reversed. That would restore some reasonable respect for CPL 470.05 (1), which legislatively directs that appeals be decided "without regard to technical errors or defects which do not affect the substantial rights of the parties." If deference to statutorily construed mandates reigns, then analysis of the entire panoply of rules of interpretation should also include the long-standing dictate of CPL 470.05 (1) and the fact that CPL 310.20 does not include a "consent of the parties" prerequisite. Based on the actual record, the jury should be deemed to have followed the court's instructions on the law, repeated in response to questions from the jury. This relevant give-and-take demonstrates the conscientious care the jury was taking not to make a hasty, oversimplified or "skewed" decision.
*494 Second, the record does not in any principled way support the supposition that defense counsel (a) never saw the verdict sheet, (b) never had a meaningful opportunity to object to it, or (c) had no affirmative professional obligation to make requests or objections in the face of unequivocal notification of the verdict sheet submission (see, People v Kinchen, 60 N.Y.2d 772, 774). A thorough analysis of the record (including the court's supplemental instructions, the jury notes, the verdict sheet, and the trial court clerk's continuous, contemporaneously recorded, handwritten minutes of the proceedings) points compellingly to the conclusion that defense counsel not only saw the checklist of charges, but undoubtedly had ample time and opportunity to object. Any other view fails to give the record its due and fair reading and inescapable inferences.
Third, the rule, as it has inexorably expanded into another per se dictate, lacks a valid doctrinal underpinning and sufficient empirical verification or necessity to sustain the amplification here. This case presents a timely and propitious occasion to consider and correct this unforeseen overextension. While my appreciation of this phenomenon is belated since I concurred in the prior cases, I am justified in now acknowledging my errant steps and lack of prescience in order to bring sharper attention to the matter so it can be rectified here or in the Legislature. Candid pursuits towards the growth and development of the law and to correct miscarriages of justice warrant exposition, not interdiction (see, Cardozo, The Growth of the Law [1923], reprinted in Selected Writings, seriatim from p 185 [Hall ed 1947]).

I.
No valid reason exists to bar a prejudice analysis when evaluating the verdict sheet claim. Harmless error factors and the reasonable interpretation of this record could certainly sustain the People's appeal in this case, to save an otherwise valid and deserved murder conviction.
A prejudice feature is supportable in light of People v Piazza (48 N.Y.2d 151). While that case was decided before the seminal People v Owens (69 N.Y.2d 585), Piazza's rationale relates directly to verdict sheets and not, as Owens did, to providing the jury with written instructions. Piazza thus more directly applies to the question of harmless error in this context than Owens and its progeny.
In Piazza, the verdict sheet listed 15 possible guilty verdicts, and then one choice of "not guilty of anything." The Court correctly *495 found that this was error because it "unduly emphasized the options of guilt" (id., at 165). It nevertheless wisely found the error harmless (id., at 165). It is inconceivable that the supposed danger in the instant case is any more serious than that in Piazza. If Piazza's miscalibration of the jury's duty did not constitute prejudice as a matter of law, then surely the labelling additives in this case should not be deemed to have prejudiced Damiano as a matter of law in a legally cognizable or principled way. Since the Legislature prescribed no consent component in CPL 310.20, the majority acknowledges that no violation of that verdict sheet statute occurred (majority opn, at 485, n 2). The Piazza approach should, therefore, still be perfectly valid.
This assessment is especially pertinent here in light of the trial court's detailed instructions during its main charge on the distinctions among depraved indifference murder, reckless manslaughter, and criminally negligent homicide. After the main charge, the Trial Judge twice reinstructed the jury on the homicide counts, both times stressing all of the distinctive elements of murder in the second degree and manslaughter in the second degree. Manifestly, the supplemental instructions may be deemed to have "unskewed," i.e., cured, any theoretical "skewing." Since the over-all charge was also error-free, there is ample reason for reinstating the conviction on this ground.
Under the analysis of People v Piazza (supra) and People v Crimmins (38 N.Y.2d 407), the labels in this case plainly played no part in defendant's murder conviction. On the contrary, the two people who substantively contributed the overwhelming evidence of defendant's guilt were defendant himself, for committing the crime and then incriminating himself in his detailed written statement and trial testimony, and his accomplice, Jamie Rullan, who confirmed Damiano's complicity by testifying against him at trial. The proof of guilt is beyond doubt or reproach.

II.
Defendant argues in this Court that the Trial Judge deprived trial counsel of the opportunity to see the verdict sheet and decide whether to challenge it or consent to it. This smooth argument is a leap from the two-page subsidiary argument first made before the Appellate Division, where appellate counsel never actually claimed that trial counsel did not see the verdict sheet or that he was deprived of an opportunity to *496 object to it. Instead, defendant's Appellate Division brief used the clever term "apparently" to shade the pertinent events  or nonevents  and declared that "it does not appear from the record that the parties were even aware that the [Trial] Court submitted a verdict sheet to the jury" (appellant's brief to App Div, at 47). The record proves that assertion to be at best disingenuous and, at worst, plainly false.
The Court is urged, nevertheless, to ignore defense counsel's failure to present any concrete and unqualified affirmation, and, instead, grant a new trial because of a perceived "silence" in the record. But the record is not silent. It fairly and reasonably shows that defense counsel did not object to the verdict sheet not because he did not see it, but rather because he either was indifferent or made a strategic choice not to object or make appropriate inquiry or request. He would now have this Court believe he does not have to ask to see it, when he undeniably knows it is about to be given to the jury and even when the jury later asks about it in a note precisely echoing the now fatal parenthetical caption (see, People v Kinchen, 60 N.Y.2d 772, supra).
This Court is further asked to believe that this manifestly careful Trial Judge would risk automatic reversal and retrial by slipping only this verdict sheet to the jury in ex parte fashion. In light of the evidence that appears in the record regarding the verdict sheet, one would have to assume also that defense counsel, aware of every nuance in all other developments unfolding at the trial, was somehow sandbagged by the Trial Judge instead of the other way around.
The following chronology, meticulously culled from the trial transcript, court exhibits, and the trial clerk's contemporaneously recorded handwritten file minutes tells anyone who examines it closely at which precise point defense counsel and the jury had to have seen and been aware of the critical verdict sheet. The Trial Judge instructed the jurors on October 20, 1992, and they returned with their verdict in the late afternoon of October 21, 1992. The court record reflects that the Judge began his final instructions to the jury at 12:13 P.M. on October 20. A jury note sent out during deliberations requests a "List of charges given or Re-Read," and bears a time marking of 1:21 P.M. Because the original file is unmistakable that between 11:25 A.M. and 1:46 P.M. on the following day, October 21, the jury was in court listening to a readback of the testimony of accomplice Jamie Rullan, interrupted only by a lunch break, the pertinent note was necessarily sent out by the jury at 1:21 P.M. on October 20.
*497 The trial court, however, did not bring the jury out until 2:30 P.M. on October 20, after it received another jury note, marked Court Exhibit 5. That note requested in part that the Judge give "the definition of charges again," requesting "1st, 2nd, manslaughter, murder." The verdict sheet, despite having been officially marked Court Exhibit 4, unquestionably had not yet been given to the jury. In response to the definitional request in Exhibit 5, the court thoroughly reinstructed the jury on the full legal definitions of all of the charges in the indictment and lesser included offenses. During this supplemental instruction, the Judge twice stated his intention to submit a statement of charges to the jury, as it had earlier requested. The Trial Judge was particularly fastidious about the very bone of contention here  submission of only authorized, written materials to the jury  and thus was careful not to submit his actual written instructions.[2]
Shortly after the first set of supplemental instructions, at 4:20 P.M. on October 20, came another jury note, marked Court Exhibit 6, that defense counsel had to have been (see, People v O'Rama, 78 N.Y.2d 270). It read in its entirety:
"Request Please Difine the Term 2nd Degree Murder (Dipraved Mind Murder)" (sic).
The salient and most pertinently significant feature of this note is that it tracks the precise terminology of the first parenthetical item on the verdict sheet, i.e., "MURDER IN THE SECOND DEGREE (Depraved Mind Murder)." The jury's reiteration mirrors the label that now vitiates the integrity of this jury verdict. The inescapable inference is that this question was in direct response to the verdict sheet that had by then been given to the jury, shortly after the Trial Judge twice told the jury and everyone else that he would submit the statement of charges. Thus, the record unassailably supports the conclusion that the verdict sheet was submitted some time after the Trial Judge's instructions in response to the question in Court Exhibit 5, before receiving the jury question in Court Exhibit 6 and, of course, a whole day before the jury returned the guilty verdict.
Notably, the record does not show defense counsel at any point of the critical sequence declaring something to the effect of, "Wait a minute, I never saw this `statement of the charges' *498 before," even though the Trial Judge twice put him on notice of it in open court. Neither did the trial court ever hear counsel say, "Excuse me, what is that language and where did it come from?" or "Wait, may I see that `statement of charges' before you give it to the jury, as I might have an objection," or even, "My client has been prejudiced by this piece of paper reflected in this jury note." The only silence in this record is defense counsel's; the pointed inference from the illuminating, record-based jury deliberation sequences is that events did not unfold as theorized. Defense trial counsel thus slipped a surefire reversal ace up the defendant's appellate sleeve.
The excusal, at the very least, of defense counsel's indifference for a whole day before the guilty verdict was rendered is not only unreasonable, but also contradicts the presumption of regularity applicable to all official acts (see, People v Richetti, 302 N.Y. 290). "The general presumption is that no official or person acting under an oath of office will do anything contrary to his [or her] official duty, or omit anything which his [or her] official duty requires to be done" (Matter of Marcellus, 165 N.Y. 70, 77; see also, Virag v Hynes, 54 N.Y.2d 437, 443). The presumption governs unless there is "substantial evidence" in the record to overcome it (see, Prince, Richardson on Evidence § 3-120, at 71 [Farrell 11th ed 1995] [emphasis added]). The official duties of a Trial Judge include showing all parties everything that is marked for identification, let alone marked, as the verdict sheet was in this case, in evidence (see, Benderson Dev. Co. v State of New York, 139 AD2d 927, 928; see also, Fisch, New York Evidence § 16, at 7 [2d ed 1977]; 1 McCormick, Evidence § 51, at 195 [4th ed 1992]). To take yet another diligent Trial Judge to task in another of this string of cases by presuming a dereliction of judicial responsibility is most unjustified and unfair in this case and flatly ignores the presumption of regularity.
Once it is established that defense counsel had the opportunity to object but did not, such actual notice, opportunity and failure to object should be deemed consent. Even assuming all verdict sheet notations should be considered tantamount to supplemental instructions forbidden under CPL 310.30  the only relevant section requiring consent  this Court's long-standing jurisprudence should prevail that a failure to object under the circumstances of this record binds the defendant and precludes appellate relief to him (see, e.g., People v Lawrence, 64 N.Y.2d 200, 206-207).
In sum, my extrapolations from this record and the clerk's minutes are reasonably rooted in fact and the regularity of the *499 proceedings, contrary to the wholly speculative suppositions defendant has made with success in two appellate courts. More complete and more accurate recordations by the court stenographer, court clerk, and Trial Judge may very well be preferred practice. Likewise, appellate review would be easier if the Trial Judge had ensured that the views of both sides were heard on the record when he twice declared his intentions with respect to the verdict sheet. It is well to recall the axiom, however, that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one" (Delaware v Van Arsdall, 475 US 673, 681; see also, Ross v Oklahoma, 487 US 81, 91; United States v Hasting, 461 US 499, 508).

III.
Since 1987, this Court has increased the per se mandate, producing reversals of criminal convictions after jury trials without harmless error analysis. By today's ruling, the disproportionate phenomenon will apply whenever a Trial Judge adds a parenthetical label or differentiation of one or more crimes on a verdict sheet. This application does not stem, as one might assume, from CPL 310.20 (2), which specifically allows submission of verdict sheets to the jury, and, importantly, contains no "consent of the parties" prerequisite. Yet, lack of consent becomes the linchpin of the majority's analysis.
In a series of cases, the judicial interpretation skipped instead to CPL 310.30, which also allows Trial Judges to provide jurors with the text of relevant statutes, but only with the consent of both parties (see, People v Spivey, 81 N.Y.2d 356; People v Kelly, 76 N.Y.2d 1013; People v Taylor, 76 N.Y.2d 873; People v Nimmons, 72 N.Y.2d 830). The fear and reasoning have developed that a parenthetical additive is tantamount to providing juries with only partial or potentially prejudicial statutory material. The Court has combined the statutes and resolved that parentheticals, therefore, invariably create the risk of unfairly skewing the deliberative process for juries (see, e.g., People v Kelly, supra).
One problem with this development is that the cases have transformed a kernel of statutory procedure and its appropriate interpretation by this Court (CPL 310.30; People v Owens, 69 N.Y.2d 585, supra) into an inviolate and absolute right. I stress that this dissenting viewpoint would not unravel the line of cases beginning with People v Owens (69 N.Y.2d 585, supra), which properly bar the submission of jury instructions or statutory text over defense objection. Since the analysis of *500 parts I and II has not prevailed, however, a narrow course correction as to that part of the rule embodied in People v Kelly (supra) and People v Spivey (supra), which perfunctorily disallows even helpful, neutral or innocuous parenthetical classifications on verdict sheets, is worthy of attention and consideration.
In the most recent pronouncement on this topic, People v Spivey (81 N.Y.2d 356, supra), the Court held that it was per se reversible error for a trial court to differentiate between two otherwise identical robbery counts by adding the parentheticals, "aided by another person" and "caused physical injury." The holding in Spivey is traced back to People v Owens (69 N.Y.2d 585, supra), in which the Court condemned as reversible error, under CPL 310.30 and the right to a fair trial, the submission over defense objection of the portion of the Judge's instruction that defined the elements of the drug charge. Because the trial court did not also submit the instruction relating to the defendant's agency defense, the partial submission created an unfair risk that the jury might believe that the court meant to highlight as more important the statutory elements of the offense.
Between Owens and Spivey, the Court decided seven related cases, all but one of which used relatively conclusory analysis (People v Sotomayer, 79 N.Y.2d 1029; People v Kelly, 76 N.Y.2d 1013, supra; People v Taylor, 76 N.Y.2d 873, supra; People v Nimmons, 72 N.Y.2d 830, supra; People v Moore, 71 N.Y.2d 684, supra; People v Brooks, 70 N.Y.2d 896; People v Sanders, 70 N.Y.2d 837). Interestingly, People v Moore is a 4 to 3 decision with two fully developed opinions in which the majority held it proper for a trial court, in response to a jury's request during deliberations, to provide a copy of the indictment. The Court reasoned that the risk of the jury process being skewed was slight, as the indictment "did not purport to be a statement of the law," and the jury was presumed to follow the court's instructions to this effect (71 NY2d, at 688, supra). This reflected a wise weighing analysis and proportional approach. But that case, representing a correct step and solid footprint, has been largely sidetracked. Despite the balance between Owens and Moore, the predominant rule has slipped into what I now believe to be "errant footsteps" (compare, People v Hobson, 39 N.Y.2d 479, 488).
After Owens, in People v Sanders (70 N.Y.2d 837, supra), the Court reversed a conviction because the Trial Judge submitted the text of the statutes defendant was accused of violating, *501 over defense objection. The Court felt constrained by Owens to reverse, especially since, as in Owens, the Trial Judge had not also provided the jury with the text of the justification defense on which defendant relied.
People v Brooks (70 N.Y.2d 896, supra) extended Owens and Sanders to the submission to the jury of incomplete statutory language, again over defense objection. The court had submitted a two-page sheet containing an abbreviated portion of the oral jury instruction, but with only an incomplete explanation of the defendant's justification defense. The Court held that the error could not be held harmless, concluding that the submission of actual instructional or statutory language is per se reversible error. Still, Brooks did not involve treating parenthetical labels as per se reversible error. The Court came closer to that crossroads in People v Nimmons (72 N.Y.2d 830, supra), decided following Brooks and People v Moore (71 N.Y.2d 684, supra).
In Nimmons, the Judge submitted a verdict sheet to the jury, as authorized under CPL 310.20. However, the Judge also presented a second sheet "listing the various counts of the indictment and defining the elements of each count in statutory language" (id., at 831). The Court simply declared this procedure to be reversible error under CPL 310.30, citing Owens, Sanders, and Brooks, and necessarily reflected the blended rationale that this sheet was tantamount to submitting statutory text to the jury.
Next came People v Taylor (76 N.Y.2d 873, supra), in which the elements of the crime were on the verdict sheet itself. Citing Nimmons, the Court reversed under CPL 310.30. For the first time, the Owens rationale that "such an error creates a risk that the jury's deliberative process will be unfairly skewed" and that "it puts in serious question the reliability of the ultimate guilt determination" (People v Taylor, supra, at 874) was fully integrated to condemn an error on a verdict sheet.
In People v Kelly (76 N.Y.2d 1013, supra), the Owens seed sprouted a new branch. The Court held that a verdict sheet that listed the charged robbery counts along with the parenthetical descriptions "use of a dangerous instrument" and "armed with a deadly weapon" violated the rule in Nimmons and Taylor, even though neither of those cited cases involved parenthetical material. While the Court in Kelly did not cite CPL 310.30, the decision evidently applied its concerns by reference to Nimmons and Taylor. After Kelly, Spivey also fell *502 and the Court again rejected harmless error analysis (People v Spivey, 81 NY2d, at 361, supra).
A major flaw on the journey from Owens to Kelly and Spivey is that parenthetical words on a verdict sheet simply are not the same as written jury instructions, statutory text or elements of crimes, as such. Rather, as analyzed in People v Kelly (164 AD2d 767, 769 [Sullivan, J., dissenting], affd 76 N.Y.2d 1013, supra), "the court did not, as in Nimmons, submit a copy of `the text of any statute', which constitutes a statutory violation and per se violation (CPL 310.30; People v Sanders, 70 N.Y.2d 837[, supra]), but, rather, only a descriptive phrase to distinguish the two counts of robbery in the first degree being submitted." Far from being the equivalent of a partial or skewed jury instruction, "the verdict sheet made no pretense of being the written equivalent of the court's oral charge" (id.).
The net consequence is that rather than assessing the real impact, if any, of innocuous labels on verdict sheets  "however limited, neutral and helpful [they] might be, especially in distinguishing two similar crimes or crimes of the same name"  Appellate Divisions instead are constrained to reverse convictions automatically and repeatedly, as this Court has instructed and is now doing itself (People v Rogers, 181 AD2d 419 ["Whatever we think of the wisdom of such a rule, we are bound by precedent"], vacated 184 AD2d 453). Yet, parentheticals of the kind used in this case are no more than semantical shorthand for the names of crimes; they are not, nor do they purport to be, jury instructions on elements of the crimes charged, and they are not inherently misleading, skewed or suspect. Thus, they ought not to be summarily and absolutely condemned.
The unlimited thrust of this case takes the precedents and their core rationale to an extreme by equating any parenthetical addition fully with substantive statutory material, irrespective of any defense objection or obligation to make inquiry, and under a statute, CPL 310.20, that does not contain a "consent of the parties" requirement that is nevertheless woven into a CPL 310.30 violation. Those are the features that make this case significantly different, promulgating an altered rule that substantially expands the original Owens rationale.
When all is said and done, the Trial Judge in this case did not presume or pretend to provide the jury with any statutory materials in this case; the jury simply received a verdict sheet under CPL 310.20. The sheet did no more than list two alternative kinds of homicide with nondispositive, innocuous parentheticals. *503 Different in kind and degree from the prejudicial material in Owens, the submission by the trial court in this case did not implicate the provisions of CPL 310.30. That is a fundamental difference between my position and the majority analysis and in no way reflects a misconstruction of what is being done here (majority opn, at 485, n 2). Manifestly, the rationale of Owens is being inexorably overextended to this situation when it should, instead, be curtailed, because it is rooted in a different statutory prerequisite and constitutes inapplicable speculation as to the nature of the harm or prejudice inflicted or feared.
Neither CPL 310.20 nor CPL 310.30 was enacted for any purpose other than as commonsense guidelines and expedients to facilitate the fair and orderly deliberations of juries in criminal cases. The myriad of trial circumstances and appellate reviews of such cases demonstrate complete frustration, not fulfillment, of these laudable legislative goals.
Section 310.20 (2), enacted in 1970 with the original Criminal Procedure Law (L 1970, ch 996, § 1), allows jurors to take into deliberations "[a] written list prepared by the court containing the offenses submitted to the jury by the court in its charge and the possible verdicts thereon." The Commission Staff Notes state that the provision merely "codifies a practice followed by numerous trial courts" (Commn Staff Notes, reprinted in Proposed NY Criminal Procedure Law § 160.20, at 229 [1967]). It is reasonable to believe that the Legislature could not have envisioned that a neutral, or at least demonstrably nonprejudicial parenthetical label, would be elevated to per se reversible status (contrast, CPL 470.05 [1]).
Similarly, the provision in CPL 310.30 that allows for the submission of the text of statutes to the jury was enacted in 1980 as another useful measure to cut down on the "time * * * spent by the court reading and rereading statutory material which could be supplied to the jury for easy reference and which would aid the jury in reaching a verdict" (Mem of Office of Ct Admin in Support of L 1980, ch 208, 1980 NY Legis Ann, at 94). This legislative intent, too, has been skewed by judicial interpretation that has implanted a delayed appellate trigger to automatically overturn convictions after fair trials.
Paradoxically, the situations the Court condemned in Kelly and Spivey are two of the most common situations where help is desirable, in that they differentiate between two theories of the same criminal act. It is common practice, for example, for a murder indictment to include both depraved indifference *504 murder and intentional murder (see, e.g., People v Gallagher, 69 N.Y.2d 525; People v Trappier, 87 N.Y.2d 55). Without some special, focused guidance, a jury is left to flounder only on its diverse memory to sort out the verdict choices. Allowing the inclusion of a parenthetical label informing the collective jury concerning the theory out of which each count grew would make good sense and avoid confusion or inconsistent verdicts.
This rubric, which this case finally unmasks as having no outer, qualifying or de minimis limits, contrasts sharply with what courts of other jurisdictions have done in this field. They applaud the practice of putting explanatory phrases on jury sheets as an "expedient" that is "commendable in promoting informed consideration by the jury" (United States v Bozza, 365 F.2d 206, 225 [Friendly, J.]; accord, United States v Swan, 396 F.2d 883, 886; see e.g., State v DeBellis, 174 NJ Super 195, 413 A2d 986, 989; People v Mackabee, 214 Cal App 3d 1250, 263 Cal Rptr 183, 185; People v Duffie, 193 Ill App 3d 737, 550 NE2d 691, 694; State v Brodniak, 221 Mont 212, 718 P2d 322). The New York interpretive experience remains stubbornly idiosyncratic, even though it lacks doctrinal underpinning. The cases in this latest ripple are steadfastly foreclosed from realistic appraisal, either of the prejudicial impact found in individual records or the empirical consequences of the per se application of this principle.

IV.
This case brings the Court to a crossroads on this verdict sheet issue: whether to adhere to Kelly and Spivey because they are recent precedents or to recognize them as missteps and promptly and justifiably correct the course. The "rule of stare decisis is not a contrivance to hamper the judge in administering justice, but is intended to advance the general usefulness of the law and thus benefit the greatest number" (von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv L Rev 409, 410). If "the court is convinced, practically beyond a reasonable doubt, that [precedents] were wrongly decided and the ends of justice require their overruling, it should depart from them rather than adhere slavishly to error" (id., at 412).
In perhaps the finest contemporary example of the prudent application of the fullness of the stare decisis doctrine, Chief Judge Breitel wrote for the majority in People v Hobson (39 N.Y.2d 479, supra). That case overruled three precedents  forthrightly declared wrongly decided  and firmly reestablished *505 the unique New York right-to-counsel rule on custodial interrogations. Significantly, the majority there could have waited for the Legislature to statutorily supplant People v Robles (27 N.Y.2d 155 [Breitel, J., dissenting, at 160]), People v Lopez (28 N.Y.2d 23 [Breitel, J., dissenting, at 26], cert denied 404 US 840) and People v Wooden (31 N.Y.2d 753, 754 [Breitel, J., concurring on constraint of the prior cases]; see, CPL 60.45). The Court, instead, proudly did its own work in its own house and did not wait for another Branch to correct the course the Judicial Branch had previously "mis-taken". Chief Judge Breitel traced the history of the detour, including his own persistent, differing votes and expressions in all three prior cases, and then cogently proclaimed the Court's legitimatizing duty to correct precedent when it has "lost its touch with reality" (People v Hobson, supra, at 487). The Court boldly acknowledged that it should not "treat every errant footprint barely hardened overnight as an inescapable mold for future travel" (People v Hobson, supra, at 488) and applied a vitally realistic version of stare decisis.
Kelly was decided in 1990; Spivey in 1993. The Court could responsibly  and in my view should  forthrightly acknowledge and adjust the loss of "touch with reality" of those cases (People v Hobson, supra, at 487; see, Note, Stare Decisis, 34 Harv L Rev 74, 76). In past cases, when compelled by "reason and substantial justice" (Silver v Great Am. Ins. Co., 29 N.Y.2d 356, 363), the Court has overruled both long-standing precedent (id.) and unworkable and unfair rules of more recent vintage (People v Bing, 76 N.Y.2d 331). In People v Bing (supra [another trilogy]), the Court retreated from some of Hobson's overextension in Bartolomeo and redrew the line in an aspect of New York's special right to counsel rule (see, People v Bartolomeo, 53 N.Y.2d 225). In doing so, the Court acknowledged both the "failure to elaborate the basis for the [overextension of the] rule, and the questionable policy behind it" (People v Bing, supra, at 342). Realism and pragmatism prevailed, yet the principle was preserved and protected.
That the verdict sheet per se reversal rule derives purely from statutory interpretation and not from a constitutional source is also not a reason for this Court to defer consideration of the correction of its own lack of foresight as to where unwarranted applications of the core principle would lead. Errant steps and disproportionate remedies, whether they are affected by constitutional expansion as in Hobson, by constitutional retrenchment as in Bing, or by candid recognition of judicial *506 overextension of statutory interpretations  as I see the instant case  merit serious reflection and exposition.
To allow a manifest injustice to be perpetuated in the name of an unremitting stare decisis dishonors the plenitude of the doctrine. I know of no such artificial, categorical prohibitions under stare decisis against the prudent recalibration of a judicial interpretive rule still burgeoning and evolving. Indeed, the concise 15-page text of Chief Judge Cardozo's Yale Law School Storrs Lecture IV (1921), entitled "Adherence to Precedent. The Subconscious Element in the Judicial Process," reveals the dynamic breadth of the doctrine enriched by its realism and acknowledgment of human and even appellate-level fallibility (Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings, at 168-184 [Hall ed 1947]).
Finally, everyone is aware that the Chief Administrative Judge's Advisory Committee on Criminal Law has once again proposed important changes in the very statutes at issue here (see, 1995 Report of the Advisory Committee on Criminal Law and Procedure to the Chief Administrative Judge of the Courts of the State of New York, at 70-73). Importantly, the rationale for the change is that "[a]ccess to these materials would significantly aid the jury without any unfair prejudice to the parties" (id., at 71 [emphasis added]). Whether the proposal is ever enacted, however, its cogent justification, as presented by the Committee of diversely experienced experts, holds true: there is simply no automatic prejudice arising from neutral label additives to verdict sheets.
In any event, no one should forget that the authentic voice of this Court speaks solely through the opinions of its members. Where Judges of a court of last resort stand on a vexing legal and practical problem ought to be reflected, therefore, only through that traditional medium, within the framework of cases properly certified to this Court as containing a leaveworthy question of law. Here, the Court is unquestionably presented with such an important case and a critical issue; the precedential ramifications for untold numbers of other cases are manifest. These concerns merit this exposition as an absolutely legitimate part of the decisional process and an intended contribution to the improvement of the law.
I vote to reverse the order of the Appellate Division on the People's appeal and reinstate the murder conviction.
Order affirmed.
NOTES
[1] Contrary to the implication by the dissent, our holding here in no way condemns annotated verdict sheets. To be sure, when counsel approve of the labels or textual references on the verdict sheet, the jurors, the parties and the court are well served, as the Legislature intended by enacting CPL 310.30. As noted by the dissent, the Legislature codified existing trial practice (see, dissenting opn, at 503), but with the significant proviso that counsel must consent to an expanded verdict sheet. No legal arguments are presented here which require that we abandon our established construction of this statutory provision in this factually disturbing case.
[2] The dissent's reliance on People v Piazza (48 N.Y.2d 151) to support a prejudice evaluation is unavailing. There, the verdict sheet comported with CPL 310.20 (2), and it was the form of the court's listing of the charges that defendant challenged on appeal as unduly emphasizing the options of guilt, not the substantive nature of the charges themselves, as challenged here. Similarly, the dissent's proposition that the absence of consent does not violate CPL 310.20 (2) misconstrues the nature of the error caused by the submission of the annotated verdict sheet. It is because the annotations contain statutory terms or elements that the consent component of CPL 310.30 is implicated.
[*] See, 1995 Report of the Advisory Committee on Criminal Law and Procedure to the Chief Administrative Judge of the Courts of the State of New York, at 70.
[1] Judge Simons' concurring opinion would suppress my obligation to vote as my judicial conscience dictates and would silence my voice. His constricting thesis on stare decisis is incompatible with that doctrine's essential nature and generous spirit, marked by a long-standing institutional, capacious tolerance of differing viewpoints (see, part IV of this opinion).
[2] A telling irony is that if the Trial Judge had given the jury the indictment itself, instead of the innocuously labelled verdict sheet, then the murder conviction would be sustained (People v Moore, 71 N.Y.2d 684).